UNITED STATES of America, Plaintiff,

v.

Robert E. FORSYTHE et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Sam MEYERS et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Frank BRUNO et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Samuel BARBOUR et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Jacob WILLIAMS et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Regis NAIRN et al., Defendants.

Crim. Nos. 76–162 to 76–164 and 76–198 to 76–200.

United States District Court,
W. D. Pennsylvania.

Feb. 22, 1977.

James E. Roark, Jeffrey A. Manning, Asst. U. S. Attys., Pittsburgh, Pa., for Government.

Jon C. Botula, Robert C. Hillen, Thomas A. Livingston, James K. O'Malley, James A.

Villanova, Charles F. Scarlata, Stanley W. Greenfield, John Dougherty, John W. Murtagh, Jr., Bernard McGinley, Anton W. Bigman, Pittsburgh, Pa., John Rogers Carroll, Philadelphia, Pa., for defendants.

## OPINION

DUMBAULD, District Judge.

■ The case at bar involves several indictments charging a bail bond agency, together with numerous members of the Pennsylvania minor judiciary as well as minor ministerial personnel such as constables, court attendants, and the like) in the Allegheny County area with actions allegedly violating 18 U.S.C. 1961–63, 84 Stat. 941–43. These provisions form Title IX (captioned "Racketeer Influenced and Corrupt Organizations", hence sometimes referred to as the "Rico" statute) of the "Organized Crime Control Act of 1970", approved October 15, 1970, 84 Stat. 922, Public Law 91–452.[1]

■ The principal purpose of the legislation is to strengthen the means of preventing money and power "obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation" from being "used to infiltrate and corrupt legitimate businesses and labor unions and to subvert and corrupt our democratic processes" so as to interfere with free competition and to burden interstate and foreign commerce.

Section 1962 sets forth the prohibited activities proscribed by the statute. Subsection (a) forbids investment of income derived from a pattern of racketeering activity in any enterprise engaged in interstate (or foreign) commerce or the activities of which affect such commerce. Subsection (b) forbids acquisition of "any interest in or control of" such an enterprise "through a pattern of racketeering activity."

Subsection (c), with which we are here principally concerned, provides that it shall be unlawful "for any person employed by or associated with" such an enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

■ Subsection (d) forbids "any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section."[2]

Viewing section 1962 synoptically, we see that subsection (a) forbids investment in an enterprise of money "derived directly or indirectly from a pattern of racketeering activity"; subsection (b) forbids the direct acquisition of an interest in an enterprise "through a pattern of racketeering activity." These two subsections relate to acquisition of an interest in or control of an enterprise by an outsider. They forbid "takeovers", to use a term familiar in corporation law. Subsection (c), on the other hand, looks inward and forbids "behavioral" wrongdoing by persons connected with the enterprise itself, to use a term familiar in antitrust analysis.[3]

1. We mention in passing that Title I of that act (18 U.S.C. 3331–3334) provides for special grand juries under certain conditions. We find no merit in the argument by counsel for some defendants that an indictment for violation of Title IX can be returned only by a Title I special grand jury if such a special grand jury is in existence. We are convinced that any duly constituted federal grand jury can indict for any federal crime.

2. We interpret subsection (d), like the Sherman Act, as punishing "the conspiracies at which it is aimed on the common law footing" and not requiring an overt act. *Nash v. U. S.*, 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232

(1913). Otherwise it would be otiose, as merely repetitious of the general conspiracy statute, 18 U.S.C. 371. If Section 1962(d) were interpreted as requiring an overt act, the allegations of the indictments are insufficient to meet such a requirement.

3. Economic analysts distinguish between "market structure" and "market behavior", and scrutinize each separately. See *U. S. v. General Dynamics Corp.*, 415 U.S. 486, 497, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); Carl Kaysen and Donald F. Turner, Antitrust Policy: An Economic and Legal Analysis (1959) xviii–xix, 21, 26–27, 59–60, 71, 75, 89, 132–33.

An "enterprise" is a separate and independent unit in the marketplace, discerned operationally through its behavior or functioning, regardless of its legal or proprietary structure. This is shown by the definition in Section 1961(4) where it is stated that the term "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

The remedies provided are also reminiscent of antitrust law. Divestiture is ordained as an appropriate civil remedy, as well as reorganization of the enterprise; and triple damage suits may be brought by private parties injured in their business or property. Section 1964. An expediting certificate filed by the Attorney General is another analogy to antitrust litigation [Section 1966]; as is the provision for "civil investigative demands" in lieu of grand jury subpoenas [Section 1968].

Forfeiture is also authorized as a remedy. If the forfeited interest is "not exercisable or transferable for value by the United States, it shall expire." Section 1963.

It remains to ascertain what a "pattern" of racketeering activity embraces. As defined in Section 1961(5) this concept "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

Finally, "racketeering activity" itself is defined, for present purposes, in Section 1961(1)(A), as "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year." [4]

It should be noted that to be "racketeering activity" the activity must be (1) bribery; (2) punishable under State law; (3) by imprisonment for more than one year.

The word "bribery" in Title IX of the 1970 statute is used in its ordinary meaning. The term is familiar in common speech. Its basic feature is the prostitution of a public trust for private gain.[5] It is the civil equivalent of simony. See Acts 8:18–21. It involves the wrongful giving or taking of a thing of value to influence official action. Bribery was a common law crime, classified by Blackstone (*Commentaries*, IV, 139) as an offense against public justice, and defined as occurring "when a judge, or other person concerned in the administration of justice, takes any undue reward to influence his behavior in office."

To constitute "racketeering activity" an offense must not only constitute "bribery" as understood in the preceding discussion, but must also constitute an offense under State law and be punishable thereunder by imprisonment for more than one year. What activities of that threefold nature are referred to by the indictments in the case at bar? What Pennsylvania criminal statutes are pertinent in delineating an offense constituting "racketeering activity"?

Pennsylvania punishes bribery *eo nomine*. 18 P.S. 4701(a) provides:

A person is guilty of bribery, a felony of the third degree,[6] if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

(1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient;

---

4. Omitted language of § 1961(1)(A) specifies other offenses not relevant to the case at bar. Likewise § 1961(1)(B), (C), and (D) list various offenses under federal law, none of which are involved here.

5. In ordinary speech the expression "commercial bribery" is often used where the delinquent party (such as a purchasing agent for a compa-

ny) violates a private trust, or duty of loyalty to his employer, as distinguished from the violation of a public trust by a corrupt public official.

6. A felony of the third degree is punishable by imprisonment up to seven years. 18 P.S. 106(b)(4).

(2) any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding; or

(3) any benefit as consideration for a violation of a known legal duty as public servant or party official.

That provision took effect on June 6, 1973. Previously, bribery *eo nomine* was a misdemeanor punishable by imprisonment not exceeding one year, with respect to the "bribor" but by imprisonment not exceeding five years, with respect to the "bribee", as set forth in former 18 P.S. 4303:

Whoever shall directly or indirectly, or by means of and through any artful and dishonest device whatever, give or make any promise, contract or agreement, for the payment, delivery, or alienation of any money, goods or other thing, in order to obtain or influence the vote, opinion, verdict, award, judgment, decree, or behavior of any member of the General Assembly, or any officer or employe of this Commonwealth, or of any political subdivision thereof, or any judge, juror, justice, referee or arbitrator, in any bill, action, suit, complaint, indictment, controversy, matter or thing, whatsoever, depending or which shall depend before him or them, is guilty of bribery, a misdemeanor, and on conviction thereof, shall be sentenced to pay a fine not exceeding five hundred dollars ($500), or to undergo imprisonment by separate or solitary confinement at labor not exceeding one (1) year, or both.

The member of assembly, or officer, or employe of the Commonwealth or of any political subdivision thereof, or any judge, juror, justice, referee, or arbitrator, who shall accept or receive, or agree to accept or receive such bribe, is guilty of receiving a bribe, a felony, and on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars ($1,000), or to undergo imprisonment by separate or solitary confinement at labor not exceeding five (5) years, or both.

At the same time there was a separate offense designated "corrupt solicitation" established by old 18 P.S. 4304:

Whoever, directly or indirectly, by offer or promise of money, office, appointment, employment, testimonial or other thing of value, or by threats or intimidation, endeavors to influence any member of the General Assembly, State, county, election, municipal or other public officer, in the discharge, performance, or nonperformance of any act, duty or obligation pertaining to such office, is guilty of corrupt solicitation, a misdemeanor, and on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars ($1,000), or to undergo imprisonment not exceeding two (2) years, or both.

Chronic recidivism with respect to corrupt solicitation, to the extent of becoming a defendant's "occupation" or profession was separately punishable under old 18 P.S. 4305:

Whoever follows the occupation or practice of soliciting members of either House of the General Assembly, or public officers of the State or of any political subdivision thereof, to corruptly influence their official action, is guilty of the practice of corrupt solicitation, a misdemeanor, and upon conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars ($1,000), or to undergo imprisonment not exceeding two (2) years, or both.

■ In our opinion, violation of the present Pennsylvania bribery statute [18 P.S. 4701(a)] clearly complies with the threefold test prescribed in 18 U.S.C. § 1961(1)(A) and constitutes "racketeering activity." But also the four former separately specified offenses (designated as "bribery", "receiving a bribe", "corrupt solicitation", and "practice of corrupt solicitation", respectively) are sufficiently similar in nature, and sufficiently correspond to the basic feature of bribery as understood at common law and in common speech, that they too constitute "bribery" within the meaning of 18 U.S.C. § 1961(1)(A). How-

ever, the *offeror*, as distinguished from the *recipient* of a bribe, can not be found guilty of "racketeering activity" with respect to a transaction occurring before June 6, 1973, because the punishment for "bribery" under Pennsylvania law was not then "imprisonment for *more* than one year" but was for a term *"not exceeding"* one year [italics supplied].

■ We agree also with the contention of counsel for some defendants that a violation of former Pennsylvania laws can not constitute "racketeering activity" if the Pennsylvania statute of limitations applicable to such offenses had run before the date of the instant indictments.

Having reviewed the substantive law relative to the pending indictments, we turn to the rules regarding the validity of the search warrant challenged by the instant motions to suppress.

■ The basic principle is that probable cause, not certain knowledge or guilt beyond a reasonable doubt, is the test to be applied for issuance of a search warrant. It is essential that the determination as to the existence of probable cause *vel non* be made independently by the issuing magistrate, and for this purpose the data submitted to him when the application is made must be adequate and sufficient to permit such a determination. *U. S. v. Harris*, 403 U.S. 573, 584, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

■ It is now settled that evidence of crime may be seized pursuant to a search warrant, as well as instrumentalities and fruits of the crime. *Warden v. Hayden*, 387 U.S. 294, 300, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

■ Another basic principle is that the validity of a warrant does not depend on whether or not it is successful in unearthing evidence of crime. As stated by

Mr. Justice Jackson in *U. S. v. di Re*, 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210 (1948): "We have had frequent occasion to point out that a search is not to be made legal by what it turns up." See also other authorities cited in Dumbauld, *The Bill of Rights and What It Means Today* (1957) 73.[7] The validity must be determined by evaluating the degree of probability of which the officer is aware at the time of application for the warrant.

■ Another rule is that if a search warrant by its terms provides for its execution "in the daytime" it can not validly be served during nighttime. *U. S. v. Merritt*, 293 F.2d 742, 744 (C.A. 3, 1961); *U. S. ex rel. Boyance v. Myers*, 398 F.2d 896, 897–99 (C.A. 3, 1968).

■ From this rule it follows inescapably, in our judgment, that the warrant in the case at bar was invalidly executed and that the evidence seized must be suppressed. The terms of the warrant clearly state: "*You are hereby commanded* to search forthwith the place named for the property specified, serving this warrant and making the search in the daytime." The alternative phrase "at any time in the day or night" is stricken through. There is no authorization granted, or showing of cause, for a night-time search. The warrant states that "The search herein authorized, must be executed within the period of 24 hours." The warrant is dated September 23, 1975, at 7:45 p.m. and is signed by Judge Gerald Weber. There is no language permitting any deviation from the requirement of daytime search.

The testimony adduced at the hearing indisputably shows that the search was begun at approximately 8:12 p.m. by gaining admission to the premises after business hours by obtaining a key from the janitor of the building. Approximately an hour later, Messrs. Levitt and Isaacs, parties con-

---

7. Conversely, a search is not illegal because it turns out to be a "dry hole" or a "water haul." One counsel at argument contended that the confidential informant mentioned in the affidavit was not reliable, because only one date was charged in the indictment whereas the informant described offenses over a longer period of time. This contention is also unfounded because the government is not obliged to indict a defendant for every offense of which it has some evidence.

nected with the business conducted on the premises being searched, happened to arrive and were shown the warrant, but the search had been going on for an hour previously. The conclusion can not be escaped that the search was conducted in an unreasonable, surreptitious and clandestine manner, and that the "poisoned fruits" gained thereby must be suppressed and excluded as evidence.

This ruling appears to be conclusive and dispositive of the pending proceedings. However, to facilitate appellate . review, since the Court of Appeals might regard the above-described defective service as merely a technical "procedural" or "ministerial" shortcoming [see *U. S. v. Hall*, 505 F.2d 961, 963 (C.A. 3, 1974)], we shall proceed to express *obiter* our views on all the issues raised during argument of the pending motions.

 First, with respect to the standing of other defendants than the bail bond company whose records were seized to move to suppress, we conclude that in view of the nature of the substantive offense here involved they do have standing. While ordinarily only the owner of the records can complain of a wrongful seizure [see *U. S. v. Miller*, 425 U.S. 435, 440, 444, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976)], the "Rico" provisions of the 1970 Crime Control Act previously discussed [especially Section 1961(4)] strike at a criminal "enterprise" whether or not it constitutes a legal entity under the usual concepts of corporation or partnership law. If otherwise unrelated persons or business organizations are to be regarded as a single unit for purposes of substantive criminal liability, it would seem that the entire aggregation brought within the prosecutorial net must also be regarded as a single unit for preliminary motions and pre-trial remedies. Hence though not technically owners of the illegally seized records under the usual tests of property law, defendants charged as forming part of the "enterprise"

would seem likewise to be in some sense participants in the proprietary rights to be exercised over instrumentalities of the enterprise. On this ground we find standing to exist.

Moreover, the present trend is to disregard concepts of property law in seizure cases, and to consider intangible activities such as conversations to be susceptible of seizure, hence of unreasonable seizure, if normal expectations of privacy are infringed. *Katz v. U. S.*, 389 U.S. 347, 352–53, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This line of argument also buttresses the conclusion that defendants have standing.

 It is also argued on behalf of defendants that the warrant is so broad and sweeping, and so lacking in specificity, as to be unreasonable and to constitute a general warrant.[8] *Hale v. Henkel*, 201 U.S. 43, 76, 26 S.Ct. 370, 50 L.Ed. 652 (1906), and other cases collected in Dumbauld, *The Bill of Rights and What It Means Today* (1957) 72; *Fisher v. U. S.*, 425 U.S. 391, 401, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

It is true that the warrant does not identify specific documents. All the executed applications for bail bonds on "Form No. ST 514 to Stuyvesant Insurance Company", for example, would seem to embrace legitimate and questioned transactions alike, and to be unduly general and burdensome.

However, the informant Mary Hupert stated that she used such documents "to calculate the amount of the cash payoffs to be delivered to each magistrate." Therefore, assuming that the affidavit and indictments sufficiently charge a crime, it would appear that the described categories of documents do indeed constitute instrumentalities of the crime, and are suitable for seizure under the traditional rule. It is common to seize money in connection with "numbers" raids. In itself money is perfectly innocent and neutral; but if it may be seized in a numbers raid, it would seem that the documents used to make calcula-

---

8. "General warrants, of course, are prohibited by the Fourth Amendment." *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976). Mr. Justice Brennan is doubtless correct in saying in that case that the test of reasonableness is the same, whether a subpoena *duces tecum* or a search warrant is involved. Ibid., 485, 96 S.Ct. 2737.

tions involved in a criminal enterprise would likewise be subject to seizure.

■ Counsel for defendant Mazzei makes another argument of considerable strength: that the data in the affidavit are too stale. It is pointed out that informant Hupert ceased to work at the bail bond agency in August of 1975, and that informant Victor Kozlowski left in 1974. Hence, it is argued, their statements do not tend to show that the documents described were on the premises *at the time the warrant was issued* (September 23, 1975).

The expiration of one month might result in staleness if this were a case involving volatile or fugitive items, such as narcotics, stolen television sets or C.B. radios, stolen cars, or the like.

But the business here was one of issuing bail bonds, the duration of which would necessarily extend over a considerable period of time in many cases (in spite of speedy trial strictures), and the documents concerning which would in all probability be preserved for longer than one month. This case seems to be suitable for application of the maxim that a state of things once proved to exist is presumed to continue until shown otherwise. In *Andresen v. Maryland*, 427 U.S. 463, 478–79, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the Supreme Court upheld, against the claim of staleness, a search of real estate and law office records where a three-month delay had ensued.

■ Finally, if the acts of alleged wrongdoing described in the affidavit do not amount to a criminal offense the warrant is also invalid for that reason. The sufficiency of the allegations in this respect may more conveniently be discussed in connection with the motions to dismiss which have been filed and argued in addition to the motions to suppress.

■ It is argued on behalf of the magistrate defendants that the statutory language is unconstitutionally vague if 18 U.S.C. § 1962(d) is construed to implicate them as persons "associated" with the "enterprise." We find it unnecessary to reach the constitutional question, since the plain interpretation of the section clearly excludes the magistrates from liability for participation in the operation of the bail bond agency.

The persons made responsible for wrongful conduct of the affairs of an "enterprise" by 18 U.S.C. § 1962(c) are those who are "employed by or associated with" the enterprise.

The term "associated with" is plainly *ejusdem generis* with the term "employed by" [9] and refers to parties "inside" the enterprise rather than those "outside." It was used by the lawmakers to embrace with sufficient generality all persons substantially participating in the operation of the organization. Their aim in using the term was to avoid either the necessity of verbose enumeration (agents, attorneys, officers, and the like, as distinguished from employees) or the risk of inviting litigation akin to that under social security and labor legislation to determine whether a given individual is an employee or possesses some other status such as an independent contractor.[10]

The magistrates are obviously "outside" the operation of the organization. Their "occupation" or "business" is service in an official capacity, not the furnishing of bail bonds for compensation. They are not included within the scope of Section 1962(d) and their motions to dismiss must be granted.

The situation is different with respect to defendant Mazzei. It is alleged that he in fact owned an interest in the bail bond business as a "silent partner." Assuming that sufficient proof of such an allegation is forthcoming, he would be liable under Section 1962(d) as a participant in the operation of the enterprise from the "inside."

---

**9.** For an amusing discussion by the late Judge Goodrich concerning the expression *ejusdem generis* see *Keystone Automobile Club v. Commissioner*, 181 F.2d 402, 404–405 (C.A. 3, 1950).

**10.** See *e. g., Walling v. Portland Terminal Co.*, 330 U.S. 148, 150–52, 67 S.Ct. 639, 91 L.Ed. 809 (1947).

Likewise, because of the independent status of the magistrates as public officials, and the scope of the Pennsylvania bribery statute (18 P.S. 4701 as previously discussed), the indictments fail to state an offense at all except to the extent that they allege a causal relationship between the payment of money or other reward to the magistrates or other officers and their "exercise of discretion as a public servant" or their "violation of a known legal duty as public servant."

In other words, since the referral of business to a bail bond agency forms no part of the official duty of a magistrate, his engaging in such referral is either a charitable or humanitarian act, on the one hand, or, on the other, a commercial transaction (if he received money or other thing of value) unconnected with and independent of his official functions.

We are not saying that receipt of compensation for referring business to a bail bond agency is a proper or decorous practice for a magistrate to pursue. Far from it. It would seem that the Supreme Court of Pennsylvania under its supervisory powers conferred by article V, sections 10 and 17(b), of the new constitution of 1968, might regulate this matter. What .we are saying is that the practice in question does not constitute bribery. It is not a violation of 18 P.S. 4701.

If the practice is wrongful or prohibited it is because it violates some other legal requirement than 18 P.S. 4701.

Paying a commission for referral of business is a common practice in many occupations. Used car dealers and many other commercial enterprises pay such compensation. In general the custom is entirely lawful, unless prohibited by some separate and independent provision of law other than 18 P.S. 4701. For example, real estate brokers or salesmen are forbidden to make such

payments to anyone except other licensed real estate brokers or salesmen. 63 P.S. 445. No such independent prohibition is relied on in the indictments in the case at bar, which are based squarely and solely upon the bribery statute, 18 P.S. 4701.

Only with respect to allegations in the indictments which do charge the magistrates with a corrupt exercise of official discretion (as by fixing a high and exorbitant figure for bail, and receiving a higher payoff because of such augmentation in the amount of the bond; or of fixing such a high and exorbitant figure, and thereafter reducing it, after a premium on the higher amount has been collected upon which the payoff is calculated) do the indictments suffice to state a cause of action.

■ Finally, with respect to the "small fry" (e. g., constables) who have no range of official discretion to exercise, the motions to dismiss should be granted for the same failure to allege facts constituting violation of official duty.

■ With respect to the counts of conspiracy, they fall along with the substantive counts to which they relate. Since a conspiracy is an agreement to perform an unlawful act,[11] there is no conspiracy if the act agreed to be performed is not illegal.

It should be added that while all the pending cases have been listed in the caption no action by the Court has been taken on pending motions under Cr.No. 76–163, any action with respect to which would be *ultra vires* and *coram non judice* as this Court is not possessed of the record at that number, an appeal being pending from this Court's refusal to amend the indictment by excising the names of parties mentioned therein as "unindicted-co-conspirators." [12] This ingenious excisionary remedy apparently did not occur to counsel for Richard M. Nixon *in consimili casu*. See *U. S. v. Mitchell*, 385 F.Supp. 1190, 1193 (D.C.1974);

---

11. *Iannelli v. U. S.*, 420 U.S. 770, 777, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). The traditional addition "or a lawful act in an unlawful manner" is not relevant here.

12. Subsequently this Court's order was affirmed by the Court of Appeals on January 31,

1977, at No. 76–2183, and presumably a supplemental hearing will be had in due course with respect to No. 76–163 for disposition of that case in conformity with the present opinion.

Edwin [Irwin] S. Rhodes, From *Burr* to *Nixon*, 35 Federal Bar Journal 217, 225 (Nos. 3–4, Summer-Fall 1976). Likewise in *Iannelli v. U. S.*, 420 U.S. 770, 771, 95 S.Ct. 1284, 1285, 43 L.Ed.2d 616 (1975), the Supreme Court affirmed a conviction where "eight petitioners, along with seven unindicted co-conspirators" were charged with gambling offenses.

For the convenience of counsel having conflicting engagements in State courts, two additional hearings were held, at which further testimony was taken. The first of these related to defendant Isaac. It appears that he was the proprietor of the bonding agency at the date of the search, having purchased it on the instalment plan from Levitt in 1975. The government concedes that nothing in the indictments charges Isaac with any illegality during his own ownership of the agency; he is charged only with complicity as an employee of Levitt during the latter's conduct of the agency under various trade names.

It was Isaac whom the security guard notified when the search took place. Isaac then called Levitt and the two of them proceeded together to the premises while the search was under way. The agents at the scene talked to Isaac and Levitt both separately and in the presence of each other. When Isaac was "dismissed" (as Colonel Klink of "Hogan's Heroes" might say) and went home Levitt remained with the agents until a late hour the next morning. The inventory of the search was given to Levitt, rather than to Isaac, the technical proprietor of the business.

▇▇▇ Failure to deliver the inventory to Isaac is urged by counsel as a reason for invalidating the search. However, the Court is convinced that this arrangement was discussed before Isaac was "dismissed" and was approved or acquiesced in by him. Levitt may be regarded as Isaac's agent to receive the inventory.

Indeed, it would seem that Isaac, a refugee from Cuba, is a person of somewhat limited education and business experience. Though familiar with the English language, he is a somewhat unintelligible and incoher-ent witness, although as prone as former vice-President Hubert Humphrey to emit an instant and prolonged torrent of words at the drop of a hat. Assistant United States Attorney Orr, who testified at the Isaac hearing, said that he did not consider Isaac as a useful witness for the Government. This seems to be a judicious decision.

It is evident that Isaac reposes great confidence in the advice of Levitt, his trusted business associate, who exerts what a probate lawyer might describe as "undue influence" over Isaac.

His present able counsel urges that Isaac's statements to the F.B.I. should be suppressed as involuntary because of such overweening influence exercised by Levitt upon Isaac. The testimony establishes that Isaac was at first represented by Samuel Reich, Esq., another able former Assistant United States Attorney having expertise in such matters, and that Reich instructed his client to make no statement to the agents in the absence of counsel. The agents did not wish to interview Isaac in the presence of counsel. During this impasse the Court finds that no one on behalf of the Government put any pressure on Isaac to talk, although when encountering him the agents would ask "Are you ready to talk yet?" or other uncoercive badinage.

However, there came a time when Levitt persuaded Isaac to cooperate with the Government, and notified the F.B.I. that Isaac wished to talk. Thereupon arrangements were made for an interview, and the purportedly incriminating statements which Isaac now seeks to suppress were made by him.

Isaac testifies that Levitt told him that Orr had said that Isaac would not be indicted. Orr denies this, saying that he had considered it premature to decide whether Isaac was of sufficient importance in the case to justify indictment. This was the same position Orr had taken during incipient plea bargaining with Reich. Orr did conclude, as previously stated, that he did not consider Isaac as a useful witness for the Government. Ultimately, of course,

Isaac was indicted, the charges being limited, as previously stated, to his actions prior to his proprietorship of the agency.

■ The Court finds that neither Orr nor the F.B.I. agents made any promise to Isaac; nor did they apply any improper pressure to induce his confession. It would seem that Isaac, like the now missing Jimmy Hoffa, simply made an unwise choice of friends in whom to place confidence. *Hoffa v. U. S.*, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). It should likewise be noted that since Isaac had not yet been indicted, the doctrine of *Massiah v. U. S.*, 377 U.S. 201, 205, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), that a statement should not be taken *ex parte* when it is known that a defendant is represented by counsel, is inapplicable to Isaac.

We can not accept the contention that Levitt in his conversations with Isaac must be regarded as an agent of the Government. Hence it is not necessary to consider the effect of *Giglio v. U. S.*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). It is true that it seems curious that Orr and the agents remained together with Levitt without Isaac so long during the night, after the search, but they deny any prior acquaintance or collusion with Levitt. It is also true that apparently Levitt is to be the Government's star witness and he is now in "protective custody" under the relocation program familiar in narcotics cases where a new identity is provided for Government witnesses.

Levitt has himself been indicted, without a grant of immunity, and from comments at the hearing one gathers the impression that it is expected that he will plead guilty to a lesser included charge. For the sake of precaution, it should be noted that the Court has not been officially apprised of any such plea bargain, and has not approved same. The formulation and approval of such a plea bargain at this time would seem premature. From the standpoint of the Government, the prosecutors might well wish to evaluate the usefulness and efficacity of Levitt's testimony at the trial before making any specific commitments. From the standpoint of the Court, until the evidence has been fully heard at trial, approval could not be granted without possible disparity of sentencing if it should appear that Levitt was himself indeed the chief culprit, relatively to other defendants, and that acceptance of the proposed bargain would establish too lenient a level of punishment when the comparative status of other defendants is taken into consideration.

■ Nevertheless the circumstances reviewed above do not suffice to establish any agency on behalf of the Government when Levitt prevailed upon his former employee to talk. Isaac simply chose to give greater weight to the advice of Levitt than to the advice of his capable counsel. This was a choice which he was free to make. Its want of wisdom does not deprive it of its voluntary character. It is like any calculated risk when various unpalatable alternatives are being weighed and conflicting counsels contend for mastery in the mind of the party who must decide among available options. We must deny the motion to suppress Isaac's statements.

■ Counsel for Isaac further contends that the search warrant is invalid *in toto* by reason of *ultra vires* seizure, or excessive execution. As stated above, no claim is made by the Government that Isaac committed any violation of law after he became owner of the business. However, many items were seized which related to Isaac's current business. Some of these were returned upon specific requests by Isaac's counsel.

It is plain that there was substantial "overkill" in execution of the search warrant. Among items seized were women's jewelry, savings bank books in various names, and other articles not described "particularly" in the warrant, as the Fourth Amendment requires.

Conceivably the jewelry might have been intended to be used as a bribe (akin to the allegations of gifts of jewelry in the case against Governor Mandel of Maryland which has received considerable notoriety of late, indeed such publicity that a mistrial

was declared when jurors watched television). But nothing in the affidavit or the search warrant in the case at bar advanced the contention that such items were instrumentalities of the alleged offence. The same is true of savings bank books. Presumably these items were simply personal possessions, perhaps deposited as collateral with the bonding agency. It is clear that articles were seized which had not been described "particularly" in the warrant, as the Fourth Amendment requires.

It is true that the exclusionary rule is a judicially created "prophylactic" remedy, designed to discourage deviations from the straight and narrow path of legality on the part of police officers. *U. S. v. Calandra*, 414 U.S. 338, 347–48, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 413, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). It is also true that such a prophylactic purpose would indeed be served if excesses in execution were held to invalidate the warrant *in toto*. In the analogy used by counsel, if a warrant for narcotics were used to seize also the pusher's television set, it would motivate the officers to be more careful if the entire "take" were suppressed as evidence.

Undoubtedly a learned and dedicated libertarian such as Mr. Justice Brennan might well hold that the entire seizure was invalid, invoking the ancient doctrine of *trespass ab initio* announced by Lord Coke in *The Six Carpenters' Case,* 8 Rep. 146a (1610).[13]

But we believe the present tendency of the courts is to curb rather than to extend the sweeping effect of the exclusionary rule, mindful of Mr. Justice Cardozo's aphorism that the consequence of that rule is that a guilty culprit must go free because the constable has blundered. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 413, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *U. S. v. Calandra*, 414 U.S. 338, 347–49, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067, decided July 6, 1976; *U. S. v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046, decided July 6, 1976.

Hence it would seem more in keeping with the present state of the law to admit as evidence the narcotics described in the warrant, but to direct that the television set be returned to its owner. Accordingly Isaac's motion to suppress the entire fruits of the warrant in the case at bar will be denied, but the Government directed to return (even in the absence of a specific request for particular items) everything seized without warrant in the warrant.

■ At the second supplemental hearing defendants Biondi, Chapas, Chesnos, and Romano urged that the indictment against them be dismissed because it was returned by an ordinary grand jury at a time when there was in session a special grand jury summoned in accordance with the provisions of the Act of 1970, 18 U.S.C. § 3331.

This ingenious contention falls far short of being persuasive. Counsel concedes the lack of authorities supporting the point. The only argument in its favor is the analogy of former Pennsylvania Orphans Court practice. Before the new constitution, separate Orphans Courts had been established in many, but not all, counties in the Commonwealth. In a county having such a separate Orphans Court, probate matters, will contests, distribution of legacies, and the like would be handled by the Orphans Court and not by the separate Court of Common Pleas. But in counties where no separate Orphans Court was in existence, such matters would of course go to the Court of Common Pleas.

This reasoning is at best far from convincing. And particularly in the case of a law enacted by the Congress of the United States, composed of representatives from different parts of the country having varying arrangements for the structure of their judicial systems, and largely influenced by the preferences of the "Sunbelt States", it

---

**13.** It will be remembered how in *Fay v. Noia*, 372 U.S. 391, 403, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), Mr. Justice Brennan cited *Bushell's Case,* a legal landmark growing out of William Penn's preaching the gospel in Grace Church Street.

is extremely unlikely that the Congress consciously chose to preserve and introduce into federal legislation these vestiges of Pennsylvania's parochial archaisms.

It is true that a special grand jury constituted in pursuance of 18 U.S.C. § 3331 is vested with special powers not possessed by an ordinary grand jury. These include the authority to make informative reports, without returning indictments with respect to the matters dealt with therein. 18 U.S.C. § 3333.

From this it would doubtless follow that if an ordinary grand jury undertook to exercise such special powers for the sake of indulging in publicity and parenetic exhortations to the citizenry, such pronouncements would be *ultra vires.* In that event the court would have to decide either to apply the rule *utile per inutile non vitiatur* if an accompanying indictment had been returned, or else fashion a "prophylactic" rule quashing the entire work-product of the grand jury. [The possibility of resort to the prophylactic route seems somewhat diminished as a consequence of the conclusions of Mr. Justice Powell in *U. S. v. Calandra,* 414 U.S. 338, 347–49, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)].

But nothing of that sort has occurred in the case at bar. The regular grand jury here has returned a plain, ordinary, conventional garden-variety indictment, unaccompanied by any "special effects" the production of which would have required the exercise of the special powers vested in an 18 U.S.C. § 3331 grand jury.

Under these circumstances, common sense indisputably indicates that any duly constituted federal grand jury can validly return a conventional indictment for violation of any provision of the federal criminal law; and we shall so hold [14] unless and until otherwise instructed by an appellate court by whose views we are bound.

Summarizing, the Court rules as follows:

(1) The search warrant is invalid because of improper service, and all evidence obtained by virtue of it or as "tainted fruits" thereof is suppressed and excluded.

(2) The indictments are dismissed with respect to the magistrate defendants, because they are not "associated" with the "enterprise" within the meaning of the statute which they are charged with violating.

(3) The indictments against minor ministerial officials (such as constables) are dismissed for the same reason, and the further reason that they are not vested by law with discretion, and hence can not be guilty of improper exercise of discretion.

(4) The conspiracy counts are dismissed whenever the substantive offenses with which they are cognate and connected are dismissed.

(5) The indictments against the remaining "inside" defendants are dismissed to the extent that they involve only acts prior to June 6, 1973, or acts no longer subject to prosecution by the Commonwealth of Pennsylvania by reason of the operation of the applicable Pennsylvania statutes of limitation at the time of return of the indictments.

(6) The indictments against said remaining "inside" defendants are dismissed except to the extent that they contain allegations charging participation of said defendants in actions amounting to "bribery" as discussed hereinabove.

(7) It will be the responsibility of the trial judge (perhaps by appropriate rulings on pending pre-trial motions such as for bills of particulars) to ensure that the trial against the remaining "inside" defendants connected with the enterprise is appropriately limited by being confined to such charges against such defendants as are adequately alleged to involve improper exercise of official discretion and are supported by sufficient independent and untainted evidence to warrant trial by jury.

(8) Except as hereinabove indicated, all motions to dismiss or to suppress evidence are denied.

---

14. See note 1, *supra.*

Counsel are directed to submit any supplemental specific orders necessary to give effect to the rulings set forth in this opinion with respect to any particular situations not dealt with herein in sufficient detail.

## ORDER

AND NOW, this 22nd day of February, 1977, upon consideration of all pending motions to suppress evidence and to dismiss, for the reasons set forth in the foregoing opinion,

IT IS ORDERED that all evidence obtained pursuant to that certain search warrant issued and executed on September 23, 1975, together with all "tainted fruits" thereof be suppressed and excluded;

AND IT IS FURTHER ORDERED, that the indictments (including connected conspiracy counts) are dismissed as to all magistrate defendants and minor ministerial official defendants (such as constables); that the indictments (including connected conspiracy counts) are dismissed as to all defendants to the extent that they involve only acts prior to June 6, 1973, or acts as to which the applicable Pennsylvania statutes of limitation had run at the time the indictments were returned, or acts not alleging participation in "bribery" within the meaning of the pertinent statutes; and that the considered motions are in all other respects denied, provided that it shall be the responsibility of the trial judge to ensure by appropriate rulings at or before trial of those defendants not dismissed by virtue of this order that prosecution shall be limited by being confined to prosecution of such charges against such defendants as are adequately alleged to involve improper exercise of official discretion and are supported by sufficient independent and untainted evidence to warrant trial by jury.