UNITED STATES of America, Plaintiff,

v.

Sam MEYERS et al., Defendants.

Crim. No. 76–163.

United States District Court,
W. D. Pennsylvania.

May 6, 1977.

---

Blair A. Griffith, U. S. Atty., for plaintiff.

John Rogers Carroll, Philadelphia, Pa., for defendant.

## OPINION

DUMBAULD, District Judge.

At the time of this Court's opinion and order in *U. S. v. Forsythe et al.,* D.C., 429 F.Supp. 715, 125 Pgh.Legal J. 119 (1977), it was specifically stated that the Court was taking no action with respect to Cr.No. 76–163, for the reason that this Court was not then possessed of the record in that case, an appeal being pending with respect to the Court's refusal to amend the indictment by excising the names of "unindicted co-conspirators." 429 F.Supp. at 726–27.

That disability having now been removed, further argument has been heard on behalf of defendant Mazzei at No. 76–163.[1] Two additional points were made: (1) legislative immunity; and (2) requirement that forfeitable property be specified in the indictment.

Mazzei moves to strike paragraph 12 of Count I of the indictment on the ground that federal constitutional law confers immunity on State legislators for actions taken in their capacity as such. That paragraph alleges that:

---

1. Other defendants at No. 76–163 were given notice and afforded opportunity to be heard, but they stipulated to the entry with respect to them of orders identical with that entered on February 22, 1977, in the other cases.

"It was further a part of the conspiracy that defendant FRANK MAZZEI would utilize his position of trust and public office as a State Senator of the Commonwealth of Pennsylvania to prevent, restrain and defeat the passage of legislation favorable to bail bond reform in the Western District of Pennsylvania."

Clearly, this paragraph charges, as part of a federal crime, that Mazzei would act in a certain way in his legislative capacity with respect to certain types of legislation.

It is equally plain that to advocate or oppose legislation is of the very essence of the function conferred by law and the voice of his constituents upon a member of a legislative body.

It remains to inquire whether federal constitutional law protects such function in the case of a State senator.

In the case of United States Senators and members of the House of Representatives, Article I, sec. 6, cl. 1 of the United States Constitution specifically provides that "The Senators and Representatives . . . for any Speech or Debate in either House . . . shall not be questioned in any other Place."

Freedom from being questioned in any other place for any speech or utterance on the floor of Congress is a right that embodies the fruits of long and strenuous struggles in Parliament against the power of the crown during the reign of the Tudors and Stuarts. Peter Wentworth died in the Tower of London in 1597 for discussing matters which Queen Elizabeth I did not wish to be debated in Parliament; King James I tore out of the Commons' journal with his own hands the page on which the protest of December 18, 1621, claiming freedom of debate had been recorded; Sir John Eliot died in the Tower in 1632 after he and eight other members had been committed in violation of the Petition of Right for their part in the exciting events of March 2, 1629, when the door was locked and the speaker held in his chair to prevent adjournment by royal command before the passage of resolutions distasteful to Charles I asserting rights of the people; the same sovereign invaded the precincts of Parliament on January 4, 1642, vainly seeking to arrest five members, who had been spirited down the Thames to safety within the confines of the City of London. With these and other colorful struggles in mind, the founding fathers cherished the important privilege of freedom of debates in Congress.[2]

The reasons and public purpose upholding this absolute immunity, as set forth in the *Tenney* case,[3] are equally applicable to State and federal legislators. These reasons are akin to those supporting judicial[4] and prosecutorial[5] immunity. They are intended to promote fearless public service, and to eliminate the burdens of litigation, not merely to determine its outcome. Even if the immunity may be abused by faithless public servants, its maintenance is essential to protection of the welfare of the people.[6]

■ Supreme Court cases show that the immunity is to be construed broadly, so as to effect its beneficial purposes. Thus in *Kilbourn v. Thompson,* 103 U.S. 168, 201–205, 26 L.Ed. 377 (1880), it was held that "speech or debate" includes more than words spoken on the floor; it embraces the offering of a resolution, presentation of a report, casting a vote on a pending matter, and, indeed, extends to all things "generally done in a session of the House by one of its members in relation to the business before

2. Dumbauld, *The Constitution of the United States* (1964) 99. See also Chafee, *Three Human Rights in the Constitution of 1787* (1956) 4–89; and *Tenney v. Brandhove,* 341 U.S. 367, 372–75, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

3. Cited in note 2, *supra.*

4. *Barr v. Matteo,* 360 U.S. 564, 569–75, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

5. *Imbler v. Pachtman,* 424 U.S. 409, 422–24, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

6. *U. S. v. Brewster,* 408 U.S. 501, 516, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972). The "smear" tactics of Senator Joseph McCarthy affords a well-remembered example of abuse of immunity. Chafee, note 2 *supra,* 88–89.

it." (*Ibid.*, at 204).[7] And in *U. S. v. Johnson,* 383 U.S. 169, 180–85, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), the Court determined that an allegation that it was part of a charged conspiracy that a Congressman made a speech for pay "necessarily contravenes the Speech or Debate Clause." (*Ibid.*, at 184–85, 86 S.Ct. at 757). This was true because "The essence of such a charge in this context is that the Congressman's conduct was improperly motivated, and . . that is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry." (*Ibid.*, at 180, 86 S.Ct. at 755).

Two other well-known recent cases reinforce the extensive interpretation of the legislative immunity. In *Gravel v. U. S.,* 408 U.S. 606, 616, 624, 92 S.Ct. 2614, 2622, 33 L.Ed.2d 583 (1972), a Senator's employee was held to have the same privileges the Senator would have, and these extended to all "prosecutions that directly impinge upon or threaten the legislative process." Committee hearings are included in the protected area of legislative nature. (The *Gravel* case arose as the result of Senator Gravel's reading of the Pentagon Papers at a meeting of the Subcommittee on Buildings and Grounds of the Senate Public Works Committee.)

The companion case of *U. S. v. Brewster,* 408 U.S. 501, 512, 520, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), made clear that customary and expected political (as distinguished from legislative) activities, only "peripherally related" to the legislative process, rather than constituting part of the legislative process itself, are not protected.

The minority in the Pentagon Papers case believed that the privilege should extend even to arrangements for publication of the papers by a private firm, emphasizing what Woodrow Wilson called the "informing function" of Congress, 408 U.S. at 639, 649–52, 92 S.Ct. 2614.

Attention was also called to the fact that the Founding Fathers intended that unimpeded communication between a Congressman and his constituents was a "natural right,"[8] akin to the First Amendment Right "to petition the Government for a redress of grievances."[9]

■ It remains to inquire, whether the doctrine of legislative immunity, as above delineated, is applicable to State legislatures. In the light of current trends in constitutional adjudication, we conclude that it is.

In numerous facets of the functioning of State governments, there have been imposed upon the States, by the "imperial judiciary,[9]" federally fashioned constitutional standards. Most familiar, of course, are the federal standards regarding the rights of persons accused of crime. But administration of school systems and prisons, establishment of electoral districts, and similar regulation of the structure and functioning of State governmental institutions has become common, as a result of the application of federally fashioned constitutional standards supplanting State discretion.[10]

The process by which federal constitutional standards are infused into State government is known as "selective incorpo-

**7.** In *Gravel v. U. S.,* 408 U.S. 606, 617, 92 S.Ct. 2614, 2623, 33 L.Ed.2d 583 (1972), the Court repeated that "to confine the protection of the Speech or Debate Clause to words spoken in debate would be an unacceptably narrow view."

**8.** 408 U.S. at 652–56, 92 S.Ct. 2614; Dumbauld, *The Political Writings of Thomas Jefferson* (1950) 162–66. Interference with the right to petition was a grievance complained of in the Declaration of Independence. Dumbauld, *The Declaration of Independence and What It Means Today* (2nd ed. 1968) 104–105.

**9.** This phrase has become prevalent of late perhaps because of familiarity with the "imperial presidency" by reason of the book with that title by Professor Arthur M. Schlesinger, Jr. See Edward H. Levi, "Some Aspects of Separation of Powers," 76 Col.L.R. (April, 1976) 371.

**10.** See, e. g., *Wyatt v. Stickney,* 344 F.Supp. 373, 382 (M.D.Ala.N.D.1972), and comment by Henry J. Friendly, "Marching Into the Third Century," 16 The Judges' Journal (spring, 1977), 6, 50. See also Archibald Cox, *The Role of the Supreme Court in American Government* (1976) 76–77, 90–91, 96–97.

ration"[11] and proceeds in the guise of interpretation of the Due Process or Equal Protection clauses of the Fourteenth Amendment. That Amendment is indeed by its terms binding on the several States, and if a particular federal standard can be derived from what Justice Holmes called the "vague contours" of due process, either by analogy to explicit provisions binding on the federal government or by the "ordered liberty" theory, the applicability of the federal standard to the operations of the State Government is assured.

An up-to-date survey of the extent to which federal constitutional standards have been imposed upon State governmental machinery is furnished in a recent article by Mr. Justice William J. Brennan, Jr., "State Constitutions and the Protection of Individual Rights," 90 Harvard L.R. (January, 1977) 489, 493–94. As there stated "It was in the years from 1962 to 1969 that the face of the law changed." (*Ibid.*, at 493).[12]

In the light of this trend, it is impossible to deny that the doctrine of legislative immunity is one of the fundamental principles of ordered Anglo-American liberty which is made binding on the States by virtue of the Fourteenth Amendment.[13]

In this connection it should be noted that if constitutional standards derived from the federal Bill of Rights (the First through the Tenth Amendments, effective in 1791, after the process of formulation and ratification had been completed) are applicable to the States, as basic and fundamental principles constituting essential features of free government, it would seem *a fortiori* that applicability would be assured in the case of principles and standards so basic and fundamental as to be embodied in the original Constitution itself[14] and not relegated to subsequent elaboration in Amendments.

These historically fortified principles include (in addition to legislative immunity, *qua de re agitur)* the right to jury trial in criminal cases, guaranteed by Article III, sec. 2, cl. 3.[15] Jury trial is now a federal constitutional requirement obligatory upon the States. *Parker v. Gladden,* 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). See also *Williams v. Florida,* 399 U.S. 78, 86, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).[16]

In view of what has been said earlier with regard to the historic origins and widely accepted significance of the legislative immunity principle, it seems certain that it must be regarded as dictated by those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," as an indispensable incident to "an Anglo-American regime of ordered liberty," as an essential ingredient "of American standards of fundamental fairness." (391 U.S. at 148, 150, 177, 88 S.Ct. at 1447, 1448, 1463).

11. Henkin, " 'Selective Incorporation' in the Fourteenth Amendment," 73 Yale L.J. (November, 1963) 74; Harlan, J., in *Duncan v. Louisiana,* 391 U.S. 145, 176, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

12. The rapid and extensive growth of incorporationism is strikingly shown by comparing Mr. Justice Brennan's catalogue of applicable standards with the state of the law in that respect as of 1957. See Dumbauld, *The Bill of Rights and What It Means Today* (1957) 132–138.

13. The test is well explained by Mr. Justice White in *Duncan v. Louisiana,* 391 U.S. 145, 148–50, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

14. On constitutional rights embodied in the original document of 1787, see Chafee, *op. cit.* note 2 *supra.*

15. This provision was subsequently supplemented by the Sixth Amendment. *Duncan v. Louisiana,* 391 U.S. 145, 153, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). See also Dumbauld, *The Constitution of the United States* (1964) 368–71.

16. The status of jury trial in civil cases, as guaranteed by the Seventh Amendment (with its specific $20 minimum) is somewhat doubtful. *Walker v. Sauvinet,* 92 U.S. 90, 23 L.Ed. 678 (1875), cited without disapproval in *N. Y. Times v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), holds that the Seventh Amendment does not apply to the States.

■ From this conclusion it follows that, since the federal constitutional standard is governing, and since, as shown previously, the allegation assailed by the motion is squarely condemned by that standard, the motion must be granted.

As a practical matter, the Government's case is not weakened by striking the assailed paragraph. Sufficient allegations remain, as in *U. S. v. Johnson,* 383 U.S. at 185, 86 S.Ct. 749, to establish an offense without resort to proof of privileged legislative conduct.[17] In the case at bar, these charge Mazzei with participation as an "insider" in operation of the Levitt enterprise. However, it has been stipulated and conceded that the Government's evidence relates to a period of time which, as held in this Court's opinion of February 22, 1977, is foreclosed by the Pennsylvania statute of limitations. Hence Mazzei is entitled to dismissal upon that ground.

The second motion advanced by defendant Mazzei is to quash the entire indictment, on the ground that it fails to comply with Rule 7(c)(2) F.R.Cr.P. which provides that: "When an offense charged may result in a criminal forfeiture, the indictment . . . shall allege the extent of the interest or property subject to forfeiture."

As pointed out in this Court's opinion of February 22, 1977, 18 U.S.C. 1963 does provide for forfeiture as a remedy for violations of 18 U.S.C. 1962. Forfeitability extends not only to any "interest" in the enterprise, but to any "claim against, or property or contractual right of any kind" affording a source of influence over the enterprise.

■ A strained construction of Section 1963 might regard profits or fruits received from the enterprise as available revenue which might be used as funds to be reinvested in the enterprise or otherwise to influence its operation.

However, the more natural interpretation is that an "interest" is akin to a continuing proprietary right in the nature of partnership or stock ownership (or holding a debt or claim, as distinguished from "equity" investment) rather than mere dividends or distributed profits.[18]

■ It is true that the mandatory requirement to describe the property interest forfeitable applies when the offense charged "may result in a criminal forfeiture," not merely when the Government in fact claims such a forfeiture. See *U. S. v. Hall,* 521 F.2d 406, 407–408 (C.A.9, 1975).[19]

■ Nevertheless, in view of the Government's concession that the evidence against Mazzei would show no participation by him in the enterprise after 1972, there is much force in the Government's contention that there no longer was in existence any forfeitable interest at the date of the indictment.[20] Under that assumption, conviction could not "result" in forfeiture, whether or not the Government sought it, and hence the requirement for description of the interest would not be operative.

Accordingly the motion to quash the indictment will be denied.

---

17. Of course, from the standpoint of media coverage or jury appeal, it might be advantageous to the Government to be able to show that the defendant took money in return for prostitution of *his own* public office, rather than merely (as in *Johnson*) for pressuring other officials to abuse *their* official powers. The defendant might thus appear more perfidious politically.

18. By contrast, the terms of 21 U.S.C. 848(a)(2)(A) provide, (with respect to narcotics offenses) for forfeiture of "the profits obtained . . . in such enterprise." 21 U.S.C. 848(a)(2)(B) then contains language substantially identical with that involved here.

19. There is an analogy to the gun laws, which apply to persons convicted of an offense punishable by imprisonment for more than one year, even if the defendant was in fact sentenced to only one month imprisonment, if the court *could have* imposed more than a year. 18 U.S.C. § 922(d)(1).

20. It would be unprofitable to speculate, under these circumstances, whether Mazzei might have an interest akin to a shifting or springing use, which would revive, for example, if profits exceeded a certain amount in a given period.